## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. MOORE & COMPANY, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civ. No. 12-1562-SLR |
| | ) |
| MAJESTIC BLUE FISHERIES, LLC, | ) |
| PACIFIC BREEZE FISHERIES, LLC, | ) |
| DONGWON INDUSTRIES COMPANY, | ) |
| LTD, JAYNE SONGMI KIM, JOYCE | ) |
| JUNGMI KIM, and JAEWOONG KIM | ) |
| | ) |
| Defendants. | ) |

---

William M. Kelleher, Esquire of Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael T. Moore, Esquire and Clay M. Naughton, Esquire of Moore & Company, P.A.

Steven J. Fineman, Esquire and Jason J. Rawnsley of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants Majestic Blue Fisheries, LLC, Pacific Breeze Fisheries, LLC, and Joyce Jungmi Kim. Of Counsel: Robert S. Salcido, Esquire and Sarah R. Teachout, Esquire, of Akin Gump Strauss Hauer & Feld LLP.

---

## MEMORANDUM OPINION

Dated: September 𝟸𝟹, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On November 26, 2012, the law firm of Moore & Company, P.A. ("Moore") filed this complaint under seal pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732, against Majestic Blue Fisheries, LLC ("Majestic Blue"), Pacific Breeze Fisheries, LLC ("Pacific Breeze"), Dongwon Industries Company, Ltd. ("Dongwon"), Jayne Songmi Kim ("Jayne Kim"), Joyce Jungmi Kim ("Joyce Kim"), and Jaewoong Kim (collectively, "defendants"). (D.I. 1) On May 21, 2013, the United States government declined to intervene in the case. (D.I. 6) On May 24, 2013, the case was unsealed. (D.I. 7) On November 14, 2013, Majestic Blue, Pacific Breeze, and Joyce Kim (collectively, "appearing defendants") moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (D.I. 17) Rather than respond to the appearing defendants' motion, on January 10, 2014, Moore filed its first amended complaint. (D.I. 23) In the first amended complaint ("amended complaint"), Moore brings claims against defendants of violation of the FCA, reverse false claims for violation of the Vessel Documentation Act, conspiracy to violate the FCA, conspiracy to commit reverse false claims for violation of the Vessel Documentation Act, reverse false claims for violation of the Act to Prevent Pollution from Ships ("APPS"), and conspiracy to commit reverse false claims for violation of APPS. (*Id.* at ¶¶ 110-62)

Currently before the court is the appearing defendants' motion to dismiss Moore's amended complaint for lack of subject matter jurisdiction pursuant to Federal

_____

[1] Dongwon, Jayne Kim, and Jaewoong Kim have not entered appearances in this case, nor do they appear to have retained counsel.

Rules of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (D.I. 25) This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3729, 3730(b).

## II. BACKGROUND

### A. Parties

Moore is a professional association of attorneys with its principal office located at 355 Alhambra Circle, Suite 1100, Coral Gables, Florida. (D.I. 23 at ¶ 11)

Majestic Blue and Pacific Breeze (collectively, "the LLCs") are Delaware limited liability corporations with a principal place of business located at 1026 Cabras Highway, Suite 110, Piti, Guam. (Id. at ¶¶ 12-13) The LLCs own, respectively, two fishing vessels, the Majestic Blue and the Pacific Breeze. (Id.) Dongwon is a South Korean corporation with its principle place of business at 275 Yanglae-Dong, Seocho-gu, Seoul, South Korea. (Id. at ¶ 14) Dongwon is in the business of buying, processing, and selling tuna and tuna products, and was the owner of the Majestic Blue and the Pacific Breeze vessels (collectively, "the vessels") (previously named the Eastern Kim and the Costa de Marfil) prior to 2008. (Id. at ¶¶ 26-27)

Jayne Kim is a Korean-born, U.S. naturalized citizen who currently resides in Korea. (Id. at ¶ 16) Joyce Kim is a Korean-born, U.S. naturalized citizen who currently resides in California. (Id. at ¶ 17) Jayne Kim and Joyce Kim are sisters, and both are daughters of Jaewoong Kim. (Id. at ¶¶ 16-17) Jayne Kim is the majority shareholder and president of Majestic Blue and the minority shareholder and treasurer of Pacific Breeze. (Id. at ¶ 16) Joyce Kim is the majority shareholder and president of Pacific

2

Breeze and the minority shareholder and treasurer of Majestic Blue. (*Id.* at ¶ 17)

Jaewoong Kim is a citizen of and resides in South Korea. (*Id.* at ¶ 15) He is the father of Jayne Kim and Joyce Kim, and the brother of J.C. Kim, Dongwon's chairman. (*Id.*) Jaewoong Kim is also a former executive of Dongwon. (*Id.*)

## B. The South Pacific Tuna Treaty

Under the South Pacific Tuna Treaty ("SPTT"), the United States provides approximately $18 million in economic assistance annually to the Foreign Fisheries Association ("FFA"), an international body designated as the "administrator" of the SPTT. (*Id.* at ¶¶ 29, 31-32) This money is allocated to the Pacific island nations that are signatories to the treaty. (*Id.* at ¶ 32) In return, the SPTT provides for a certain number of fishing licenses to be issued to U.S. fishing vessels, permitting them to fish for tuna in exclusive zones in the South Pacific, "some of the most tuna rich waters in the world." (*Id.* at ¶¶ 29-30) South Korea is not a signatory to the SPTT. (*Id.* at ¶ 30)

To qualify for a SPTT license, a fishing vessel needs a United States Coast Guard (USCG) Certificate of Documentation with a registry endorsement. (*Id.* at ¶ 33) This certification is only available to vessels "under the ownership and control of U.S. citizens." (*Id.*) The license applications are submitted to the National Marine Fisheries Service and are issued by the FFA. (*Id.* at ¶ 31)

## C. Alleged Facts Related to Claims Under the False Claims Act and Vessel Documentation Act

On March 25, 2008, Joyce Kim and Jayne Kim founded and registered Majestic Blue and Pacific Breeze. (*Id.* at ¶ 36) Jayne Kim owns 51% of Majestic Blue and 49%

3

of Pacific Breeze, while Joyce Kim owns 51% of Pacific Breeze and 49% of Majestic Blue. (*Id.* at ¶ 43) There are no other purported owners or shareholders in the LLCs. (*Id.*) Moore alleges that Joyce Kim and Jayne Kim each only invested $50 in the LLCs with no further investment. (*Id.* at ¶ 37)

On April 23, 2008, Dongwon executed bills of sale that allegedly sold the vessels to Majestic Blue and Pacific Breeze, respectively, for $10 each. (*Id.* at ¶ 41) In the original purchase and sale agreement executed by Dongwon, the LLCs agreed to pay $4.4 million for each vessel. The agreement did not hold Joyce Kim or Jayne Kim responsible for the debt and no mortgage was taken out on the vessels. (*Id.* at ¶ 38) Moore alleges that this arrangement occurred because Dongwon never actually gave up ownership or control of the vessels; instead, Dongwon used Joyce Kim and Jayne Kim as "straw owners" of the LLCs because of their American citizenship. (*Id.* at ¶¶ 28, 39)

After transferring ownership of the vessels to the LLCs, the LLCs applied for FFA fishing licenses to fish for tuna in the waters covered by the SPTT. (*Id.* at ¶¶ 48-53) In April and May 2008, William Phil, a purported manager of the LLCs, sent emails to the National Oceanic and Atmospheric Administration ("NOAA") seeking SPTT licenses. (*Id.* at ¶ 49) Moore alleges that William Phil was not a manager of the LLCs, but "is actually a pseudonym for three Korean nationals who are also employees of Dongwon who operated under the false name in order to sound more like an American citizen." (*Id.* at ¶ 50) Moore further alleges that neither Joyce Kim nor the general manager of the LLCs, Jurgen Unterberg ("Unterberg"), knew who William Phil was though both

4

believed he was the manager of the LLCs, reinforcing Dongwon's control over the LLCs "to the exclusion" of "U.S. citizens that purported[ly] owned and operated [the vessels] according to the LLCs' corporate documents and the [v]essels' documentation. (*Id.* at ¶¶ 49, 57)

On May 15, 2008, Jayne Kim and Joyce Kim, on behalf of the LLCs, submitted initial applications for U.S. documentation for the fishing vessels. (*Id.* at ¶ 51) The applications certified that within the LLCs, "non-citizens do not have authority within a management group, whether through veto power, combined voting, or otherwise, to exercise control over the LLC." (*Id.* at ¶ 52) Moore alleges that this certification was a "misrepresentation" of the actual control of the LLCs, and that the LLCs were actually controlled by Dongwon, a foreign corporation. (*Id.* at ¶ 53) On May 20, 2008, the National Vessel Documentation Center granted temporary U.S. documentation for the vessels. (*Id.*)

On May 21, 2008, the LLCs signed agreements with Dongwon for crew manning; ship maintenance, supply, and insurance; and tuna supply. (*Id.* at ¶ 54) Moore alleges that these agreements authorize Dongwon to exercise complete control over the vessels and the LLCs. (*Id.* at ¶¶ 54, 67-71) Furthermore, Moore alleges that Dongwon exercised control over the vessels beyond these agreements by controlling the employment of American captains, who were necessary to maintain the facade of American control but did not exert any actual control. (*Id.* at ¶¶ 72-87)

On July 1, 2008, the FFA issued certificates of registration for the vessels, allowing them to fish in SPTT waters under the U.S. flag. (*Id.* at ¶ 60) Moore alleges

5

that the grant of the FFA licenses was based on false statements in the application indicating American control of the LLCs and vessels, when in fact both were controlled by Dongwon. (*Id.*) Moore alleges that this "fraud" continues through today, as the Pacific Breeze vessel continues to fish in the SPTT-protected waters under the U.S. flag.[2] (*Id.* at ¶ 91)

## D. Alleged Facts Related to Claims under APPS

In December 2008, Captain John Jeskevicius ("Jeskevicius"), captain of the Majestic Blue vessel, realized that the crew onboard the ship was illegally dumping trash over the side of the vessel. (*Id.* at ¶¶ 92-95) Through December 2008, Jeskevicius reported the illegal activity to Unterberg multiple times via email. (*Id.* at ¶¶ 95-98, 100) On December 27, 2008, Jeskevicius resigned as captain, allegedly because of the illegal garbage dumping. (*Id.* at ¶ 99) In fall 2009, Captain Doug Pine ("Pine"), the next captain of the Majestic Blue vessel, also observed illegal dumping. (*Id.* at ¶¶ 102-05) Despite having knowledge of this illegal activity, defendants allegedly did nothing to change the Majestic Blue vessel's policies or otherwise stop the dumping from occurring. (*Id.* at ¶ 106) Hill, the last captain of the Majestic Blue vessel before it sank, observed illegal dumping as well. (*Id.* at ¶¶ 106-09) Moore alleges that "[Hill] and other crew members knew about the dumping but intentionally did not report it." (*Id.* at ¶ 108) Hill allegedly told Unterberg, but Moore alleges that Unterberg had no authority within Majestic Blue to address the problem himself. (*Id.* at ¶ 109)

---

[2] The Majestic Blue vessel maintained its SPTT licenses until it sank in June 2010. (D.I. 23 at ¶¶ 83, 91) The captain at the time, David Hill ("Hill"), died. (*Id.* at ¶ 83) Moore represented Hill's wife in a wrongful death action against Dongwon and Majestic Blue. (D.I. 26 at 4)

## III. STANDARD OF REVIEW

Not only may the lack of subject matter jurisdiction be raised at any time, it cannot be waived and the court is obliged to address the issue on its own motion. *See Moodie v. Fed. Reserve Bank of NY*, 58 F.3d 879, 882 (2d Cir. 1995). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000).

Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *See* 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408-09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Under a factual attack, however, the court is not "confine[d] to allegations in the . . . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-92 (3d Cir. 1977). In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court

7

from evaluating for itself the merits of jurisdictional claims." *Carpet Group*, 227 F.3d at 69 (quoting *Mortensen*, 549 F.2d at 891).

## IV. DISCUSSION

### A. The False Claims Act

The False Claims Act ("FCA") creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A). The FCA seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 281 (2010). Prior to the Patient Protection and Affordable Care Act ("PPACA") legislation, enacted on March 23, 2010,[3] the FCA provided in pertinent part that:

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 USC § 3730(e)(4)(A)&(B) (2008) ("pre-PPACA FCA").

The amended FCA provides in part:

---

[3]Effective July 22, 2010.

8

(4)(A) The court shall dismiss an action or claim under this section,
unless opposed by the Government, if substantially the same allegations
or transactions as alleged in the action or claim were publicly disclosed
(i) in a Federal criminal, civil, or administrative hearing in which the
Government or its agent is a party;
(ii) in a congressional, Government Accountability Office, or other Federal
report, hearing, audit, or investigation; or
(iii) from the news media,
unless the action is brought by the Attorney General or the person
bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual
who either (i) prior to a public disclosure under subsection (e)(4)(a), has
voluntarily disclosed to the Government the information on which
allegations or transactions in a claim are based, or (2) who has knowledge
that is independent of and materially adds to the publicly disclosed
allegations or transactions, and who has voluntarily provided the
information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A)&(B) ("amended FCA").

The parties disagree over which version of the statute applies to the claims at

bar. The Supreme Court in *Graham County* explained that "[t]he legislation makes no

mention of retroactivity, which would be necessary for its application to pending cases

given that it eliminates petitioners' claimed defense to a *qui tam* suit." *Graham County*,

559 U.S. 281, 283 n.1 (citing *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520

U.S. 939, 948 (1997)); *see also, United States ex rel. Zizic v. Q2Administrators, LLC*,

728 F.3d 228, 232 n.3 (3d Cir. 2013) (applying pre-amendment public disclosure bar to

a matter which was pending before the amendment). In *Hughes*, the Supreme Court

addressed whether an amendment controls when it becomes effective before a suit

was commenced, noting that "the legal effect of conduct should ordinarily be assessed

under the law that existed when the conduct took place . . . ." *Hughes*, 520 U.S. 939,

946 (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)). The Supreme

9

Court concluded that "[g]iven the absence of a clear statutory expression of congressional intent to apply the . . . amendment to conduct completed before its enactment, we apply our presumption against retroactivity . . . ." *Id*. at 952.

The case at bar was filed after the PPACA amendment took effect and involves continuing conduct, both before and after the PPACA amendment. Based on the reasoning of the Supreme Court discussed above, the court applies the pre-PPACA FCA to pre-amendment conduct and the amended FCA[4] to later conduct. *See U.S. ex rel. Judd v. Quest Diagnostics Inc.*, Civ. No. 10-4914, 2014 WL 2435659 (D.N.J. May 30, 2014).

## B. Application of the Public Disclosure Provision

To determine if the pre-PPACA FCA public disclosure provision applies to bar a relator's complaint, the Third Circuit explained that a court

> must first assess whether the relator's claim is based on publicly disclosed allegations or transactions. This, in turn, requires a twofold analysis. First, [the court] determine[s] whether the information was disclosed via one of the sources listed in § 3730(e)(4)(A). Second, [the court] decide[s] whether the relator's complaint is based on those disclosures. To be "based upon" the publicly revealed allegations or transactions the complaint need only be "supported by" or "substantially similar to" the disclosed allegations and transactions.[5]

*United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 519 (3d Cir. 2007). Appearing defendants argue that the allegations in the amended complaint

---

[4]While the amended FCA does not explicitly use jurisdictional language, stating that a court "shall dismiss an action or claim," the application of such statute necessitates the analysis of any "public disclosures." The court analyzes the later conduct under the amended FCA pursuant to Federal Rules of Civil Procedure 12(b)(1).

[5]Although this analysis is directed to the pre-PPACA FCA, the court discerns no difference in the application of such analysis to the amended FCA.

10

were disclosed (1) "as early as 2009 through several news media articles, postings, and podcasts on internet websites" (D.I. 26 at 9-10 & n.6); (2) "multiple publicly disclosed government reports," obtained by Moore through Freedom of Information Act ("FOIA") requests, dated July 3, 2010 and April 19, 2011; and (3) prior civil litigation.

### 1. Sources

#### a. News media

The "sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep.'" *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, — U.S. —, 131 S. Ct. 1885, 1891 (2011) (citing *Graham County*, 559 U.S. at 290). While traditional news sources (including internet sources) constitute news media, the question in "public disclosure" cases is whether a disclosure on a particular website constitutes a "public disclosure" for the purposes of the FCA. *United States ex rel. Repko v. Guthrie Clinic, P.C.*, 2011 WL 3875987, at *7 (M.D. Pa. Sept. 1, 2011), affirmed by *United States ex rel. Repko v. Guthrie Clinic, P.C.*, 490 F. App'x. 502, 504 (3d Cir. 2012). In *Repko*, the district court noted:

> Generally accessible websites are available to anyone with an internet connection and a web browser, and access is not restricted. Though they are not traditional news sources, they serve the same purpose as newspapers or radio broadcasts, to provide the general public with access to information. They are easily accessible and any stranger to a fraud transaction could discover the relevant information on them.

*Id.* at *7. The court concluded that the four websites at issue in that case publically disclosed the information contained therein: a website which worked to "gather and publicize information about nonprofit organizations;" one which billed itself as "the leading source of information about philanthropy worldwide," which contained a

11

comprehensive database; information for investors on the Standard & Poors website; and the Bloomberg Professional website which "provid[ed] access to all the news, analytics, communications, charts, liquidity, functionality and execution services" to assist investors. *Id*. at *8. In *United States ex rel. Simpson v. Bayer Corp.*, 2013 WL 4710587 (D.N.J. Aug. 30, 2013), the court stated "while it is certainly the case that websites may constitute news media in certain instances, not everything posted on the internet qualifies." *Id*. at *7. Using a case-by-case framework, the court concluded that,

[u]nlike an article on a website maintained by a recognized news outlet, a trade journal, or even a promotional website geared toward the dissemination of information, the anonymous postings in this case . . . amounted to nothing more than vague allegations in an informal forum discussion without any indicia of reliability or substantiation. Healthboards.com holds itself out [as] an online group support community. Similarly, although the homepage of cafépharma.com contains a section entitled "current news," the posting on which [defendant] relies is on the message board portion of the site.

*Id*.

In the case at bar, appearing defendants allege that the information posted on the following websites are public disclosures: an interview with former Captain Pine posted on CNN's website, "iReport.com," on October 28 2009 ("Pine recording") (D.I. 29, ex. A, B, G); a related article "Mutiny on American Ship, first in over 30 years," dated October 27, 2009, posted on iReport.com ("Mutiny article") (*id*., ex. B); reproductions of the Pine recording and Mutiny article on other blogs (*id*., ex. C, E-G); an article "Flogging and Mutiny in the 21st Century, Proudly Waving the Stars and Stripes," dated October 22, 2009, posted on maritimeaccident.org ("Maritime Accident article") (*id*., ex. C, D); a blog posting at bitterendblog.com ("BitterEnd blog post") (*id*.,

12

ex. H); and an article "Coast Guard Probes Island Mariner's Account of Fiasco at Sea," posted on vashonbeachcomber.com, dated November 17, 2009 ("Beachcomber article") (*id.*, ex. I). Moore challenges the consideration of the Pine recording as a public disclosure. While "iReport.com" is arguably part of CNN's website, the website is a "community forum" and contains the disclaimer: "Stories submitted to CNN iReport are not edited, fact-checked or screened before they post. So we mark all iReports with the label 'NOT VETTED BY CNN' to let you know that this story hasn't been both checked and cleared by a CNN editor." The court concludes that the postings on the iReport website are not "news media" in the context of the FCA. Similarly, the blog postings (e.g., BitterEnd blog and Sea Fever blog) are not "news media."

The Maritime Accident and Beachcomber articles[6] allege the following pertinent facts: The Majestic Blue vessel was a "flag of convenience vessel." After the vessel was registered in the U.S., it needed an American captain. Therefore, "the Korean captain became the fishmaster and Captain Pine joined as Captain." While the company boasts that it is "100% owned by United States Citize[ns]," the vessel was "Korean-managed" and "operated by a Korean company." Captain Pine was only a "'paper captain' to meet the requirements of the US flag . . . ." The vessel's officers were Korean and the deck hands were Korean, Indonesian and Filipino. The articles

---

[6]Moore does not challenge these sources as qualifying sources. The maritimeaccident.org website describes itself as "an authoritative, credible source, popular among both seafarers and maritime accident investigators." The vashonbeachcomber.com website provides the local news for Vashon-Maury Island. Both of these websites qualify as "news media."

13

also allege waste management violations,[7] stating:

> The Korean officers refused to comply with MARPOL regulations, claims
> Pine. A vessel waste management plan was posted throughout the ship
> but ignored, even though the vessel had an adequate incinerator ad
> oily-water separator. "I brought it up at the monthly safety meetings but
> was ignored," says Pine, who has video and photographic evidence that
> the Korean officers "intentionally and wilfully" disposed of plastics wastes
> and oil wastes at sea: "They didn't want to waste fuel by using the
> incinerator," he says.

(D.I. 27, ex. C)

### b. FOIA requests

Analyzing the pre-PPACA FCA, the Supreme Court concluded that a "written
agency response to a FOIA request falls within the ordinary meaning of 'report.'"
*Schindler*, 131 S.Ct. at 1893. The Supreme Court explained that "[s]uch an agency
response plainly is 'something that gives information,' a 'notification,' and an 'official or
formal statement of facts.'" *Id*. Moreover, "[a]ny records the agency produces along
with its written FOIA response are part of the response . . . ." *Id*. The Supreme Court
has described "a classic example of the 'opportunistic' litigation that the public
disclosure bar is designed to discourage" as a lawsuit filed after reviewing FOIA
requests or "identify[ing] a few regulatory filing and certification requirements,
submit[ing] FOIA requests until . . . discover[ing] a federal contractor who is out of
compliance, and potentially reap[ing] a windfall in a *qui tam* action under the FCA." *Id*.
at 1894. In *U.S. ex rel. Kraxberger v. Kansas City Power and Light Co.*, 756 F.3d 1075
(8th Cir. 2014), the Eight Circuit applied the reasoning in *Shindler* to the amended FCA,

---

[7]Also alleged on shiptalk.com, which aggregates news from sources around the
world. (D.I. 27 ex. P)

finding that "documents disclosed by [the General Services Administration] in response to counsel's FOIA request qualify as public disclosure under *Schindler*." *Id.* at 1079. This court agrees. The amended FCA did not substantially change "report" as a public disclosure, therefore, the responses to the FOIA requests qualify as public disclosures under both versions of the FCA.

The responses to the FOIA provided the following pertinent factual information: The certificates of vessel's nationality and sale documents evidence that Dongwon owned the vessels and the purchase price was $4.4 million. The bill of sale lists the amount paid as $10. (D.I 23, exs. 2, 6, 7) The signed certificates of documentation for the vessels aver that the persons who manage the LLCs "are citizens of the United States; and non-citizens do not have authority within a management group, whether through veto power, combined voting, or otherwise, to exercise control over the LLC." (*Id.*, ex. 8) Accompanying the FOIA responses were emails including the following: (1) an email from Raymond Clarke (with the NOAA) to Eric Dila (with the USCG) regarding vessel insurance, where Clarke appears to question the documentation of the vessels as U.S. vessels (*id.*, ex. 12);[8] (2) an email from K.Y. Hwang (with Dongwon Industries) stating that he is "in charge of the care for" the vessels (*id.*, ex. 14); and (3) emails regarding the vessel sent from individuals at Dongwon to NOAA (*id.*, ex. 16-17).

### c. Litigation documents

The disclosures in the civil litigation[9] qualify as "public disclosures" only under the

---

[8]This email is in response to an inquiry from William Phil.

[9]*Hill v. Majestic Blue Fisheries, LLC*, Civ. No. 10-23886 (S.D. Fla. filed Oct. 26, 2010), subsequently transferred to the District of Guam, *Hill v. Majestic Blue Fisheries,*

15

pre-PPACA FCA, as the government was not a party to the lawsuit. *See Zizic*, 728 F.3d at 235 (holding that civil litigation public documents and discovery (not subject to "any court imposed limitation as to its use") are public disclosures) (citations omitted); § 3730(e)(4)(A). The litigation documents (D.I. 27, ex. L) allege the following facts: Dongwon is a Korean corporation and was the "legal owner, operator, and/or manager of, and/or maintained and/or controlled the [Majestic Blue vessel]." (*Id.* at ¶ 10) Dongwon formed Majestic Blue "to act as the record owner of the vessel Majestic Blue," in order to operate as a U.S.-flagged fishing vessel. Dongwon transferred the vessels to two Delaware LLCs it formed, "for the sole purpose of owning its two U.S.-flagged vessels, which must be owned by U.S. citizens." (*Id.* at ¶¶ 37, 43) Dongwon was the alter ego of Majestic Blue based on its alleged control over Majestic Blue's operations, including the payment of employees and captain as well as making major operational and onboard "policies, procedures and daily operations" decisions. Dongwon obtained fishing licenses from the NOAA and USCG, on behalf of Majestic Blue, in order to "fish in lucrative fishing grounds in which only U.S.-flagged vessels or vessels flying the flag of other signatories to the applicable treaty could fish." (*Id.* at ¶ 37) The officers and crew on the Majestic Blue vessel were Korean or from other Southeast Asian countries. The U.S. captains were merely "window dressing" to meet crewing requirements, and were not employed "to command the Korean-operated, managed and de facto owned Purse Seiner." (*Id.* at ¶¶ 62-68) The crew violated international pollution treaties,

---

*LLC*, Civ. No. 11-34 (D. Guam transferred Nov. 21, 2011) (collectively, the "wrongful death litigation") and *Majestic Blue Fisheries, LLC v. Douglas E. Pine*, Civ. No. 10-4 (D. Guam filed Apr. 13, 2010).

16

including MARPOL. This "led several captains to complain to . . . Dongwon regarding these violations and even led some to terminate their employment with Majestic Blue and Dongwon in fear of losing their U.S. Master's licenses." (*Id.* at ¶¶ 67, 70)

## 2. Allegation or transaction of fraud

A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *Zizic*, 728 F.3d at 236 (citing *United States ex rel. Dunleavy v. Cnty. of Del.*, 123 F.3d 734, 741 (3d Cir.1997), abrogated on other grounds by *Graham County*, 559 U.S. 280). The Third Circuit has adopted the following formula to determine whether information publicly disclosed in a specified source qualifies as an allegation or transaction of fraud:

If $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$ represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of $X$ and $Y$ must be revealed, from which readers or listeners may infer $Z$, i.e., the conclusion that fraud has been committed.

*Id.* (quoting *Dunleavy*, 123 F.3d at 741). The essential elements of the allegation of fraud [Z] are "a misrepresented [X] and a true [Y] state of facts." *Atkinson*, 473 F.3d at 519 (citation omitted). The public disclosure bar applies "if either $Z$ (fraud) or both $X$ (misrepresented facts) and $Y$ (true facts) are [publicly] disclosed by way of a listed source." *Id.*

Moore alleges that defendants fraudulently obtained USCG certificates of documentation in order to request fishing licenses from the government. The certificates of documentation require compliance with the citizenship requirement and that non-citizens do not exercise control over the owning entity. Defendants continue

17

the fraud by "renewing their U.S. Documentation by recertifying (falsely) each year that the LLCs were not controlled by non-U.S. Citizens; and by yearly presenting their fraudulently obtained Certificates of Documentation to the NMFS to obtain a renewal of the FAA license purchased by the Government." (D.I. 23 at 129) The news articles make reference to a "paper captain" and call into question the management of the ship. Moreover, the articles reference a "paper captain." The FOIA documents add the formal documents setting up the LLCs and transferring ownership of the vessels, with bills of sale for $10. The court concludes that the articles and FOIA documents qualify as an allegation or transaction of fraud. The litigation documents present all of the facts and even allege the specific fraud from the amended complaint.

### 3. "Based on" public disclosures

The court must finally "decide 'whether the relator's complaint is based on those [public] disclosures.' To be based on allegations or transactions of fraud, claims need not be 'actually derived from' public disclosures. Rather, claims need only be 'supported by' or 'substantially similar to' public disclosures." *Zizic*, 728 F.3d at 237 (citations omitted). "[T]he public disclosure bar is not confined to actions 'solely based upon' public disclosures. Instead, the public disclosure bar covers actions simply 'based upon' public disclosures, including actions 'even partly based upon' such allegations or transactions." *Id.* at 238 (citations omitted). As the Third Circuit describes "based on" as including claims "substantially similar" to public disclosures, such analysis applies to either version of the FCA. Comparing the claims to the public disclosures, the amended complaint is based on the public disclosures (either the combination of the articles and the FOIA responses or the combination of all three

18

disclosures). Therefore, under both versions of the FCA, Moore's claims must be dismissed.

### C. Original Source Analysis

#### 1. Pre-PPACA FCA

Although the conduct is based on public disclosures, Moore's claim survives if Moore is an original source. The Third Circuit explained that,

> [t]o be an original source, a relator's knowledge must be both direct and independent. "Independent knowledge" is knowledge that does not depend on public disclosures. "Direct knowledge" is knowledge obtained without any "intervening agency, instrumentality or influence: immediate." The FCA "seeks to encourage persons with 'first hand knowledge of fraudulent misconduct,' or those 'who are either close observers or otherwise involved in the fraudulent activity' to come forward."

*Atkinson*, 473 F.3d at 520.

Moore concedes that certain of its information was uncovered during its representation of Captain Hill in the wrongful death litigation. Moore's declaration filed with its brief evidences that the essential elements of the fraud were substantiated by depositions and discovery in the civil litigations. (D.I. 29, ex.1) The Third Circuit has explained that a relator is not an "original source" when the relator's information was obtained through discovery during the course of representing a client in an action. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160-61 (3d Cir. 1991). Moore alleges in a conclusory fashion that "it was only after more than two years of its own investigation that [it] had gathered sufficient information and evidence to file this action . . . ." (D.I. 29 at 1) The declaration provides that certain information was "independently obtained" by Moore

demonstrating: Dongwon's control over the vessels, employees, captains, and violations; former ownership and sale documents for the vessels; control over the maintenance of the vessels; control over the USCG's inspection of the vessels and information provided to the USCG. (*Id.* at 4-7) Such information is duplicative of that obtained from the public disclosures, particularly from the civil litigations. This does not suffice to confer "original source" status on Moore. *Atkinson*, 473 F.3d at 522-23 (advocating a case-by-case approach to determining whether relator is an "original source," which depends on the nature and extent of reliance upon information available in the public domain.). The court concludes that Moore is not an original source.

### 1. Amended FCA

The definition of "original source" in the amended FCA differs from the pre-PPACA version, requiring "knowledge that is independent of[10] and materially adds to the publicly disclosed allegations or transactions." While the Third Circuit has not yet defined the new language of the amended FCA, its previous decisions are informative in interpreting this language:

> [T]he extent of reliance on information already in the public domain should be a consideration during the original source inquiry, even if that information is not a public disclosure within the meaning of § 3730(e)(4)(A). While it is true that reliance solely on "public disclosures" under § 3730(e)(4)(A) is always insufficient under § 3730(e)(4)(B) to confer original source status, reliance on public information that does not qualify as a public disclosure under § 3730(e)(4)(A) may also preclude original source status depending on the extent of that reliance and the nature of the information in the public domain. Thus, in deciding whether a relator's reliance on public records bars him from being an original source under § 3730(e)(4)(B), courts should consider both "the availability

---

[10]Contrasted with the "direct and independent" requirement of the pre-PPACA version.

of the information and the amount of labor and deduction required to construct the claim." The more obscure the records and the more significant the investigative input of the relator, the more likely it is that granting original source status will fulfill the FCA's "twin goals of rejecting suits which the government is capable or pursuing itself, while promoting those which the government is not equipped to bring on its own."

*Atkinson*, 473 F.3d at 522 (citations omitted).

In the case at bar, the information regarding the purchase of the vessels and formation of the LLCs is disclosed in the FOIA responses. The inference of "paper captain" is disclosed by the articles. As discussed above, the allegedly "independent" information, which Moore relies upon to "materially add" to the public disclosures, are duplicative of the information in the litigation documents. While these documents may not qualify as public disclosures under the amended FCA, such documents are in the public domain and not "obscure." *See also, Zizic*, 728 F.3d at 240 (holding that a relator who merely applies his expertise to publically disclosed information does not have independent knowledge). The court concludes Moore is not an original source under the amended FCA.

## V. CONCLUSION

For the aforementioned reasons, the court grants appearing defendants' motion to dismiss the amended complaint.[11] (D.I. 25) An appropriate order shall issue.[12]

---

[11]The court does not reach appearing defendants' arguments under Federal Rule of Civil Procedure 12(b)(6). As Moore has not filed proofs of service for Dongwon, Jayne Kim, and Jaewoong Kim within the 120 days allowed by Federal Rule of Civil Procedure (4)(m) and these defendants have not entered appearances, the case will be closed.

[12]Despite the fact that the court is more than a little alarmed if such conduct as attributed at bar to defendants apparently goes uncorrected by the government agencies responsible for oversight of the fishing industry.