# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. MOORE & COMPANY, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 12-1562-SLR |
| | ) |
| MAJESTIC BLUE FISHERIES, LLC,<br>PACIFIC BREEZE FISHERIES, LLC,<br>and JOYCE JUNGMI KIM, | ) |
| | ) |
| Defendants. | ) |

William M. Kelleher, Esquire, of Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Michael T. Moore, Esquire, and Clay M. Naughton, Esquire, of Moore & Company, P.A.

Steven J. Fineman, Esquire, and Jason J. Rawnsley, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants Majestic Blue Fisheries, LLC, Pacific Breeze Fisheries, LLC, and Joyce Jungmi Kim. Of Counsel: Robert S. Salcido, Esquire, of Akin Gump Strauss Hauer & Feld LLP.

## MEMORANDUM OPINION

Dated: July 26, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On November 26, 2012, the law firm of Moore & Company, P.A. ("Moore") filed
this complaint under seal pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-
3732, against Majestic Blue Fisheries, LLC ("Majestic Blue"), Pacific Breeze Fisheries,
LLC ("Pacific Breeze"), and Joyce Jungmi Kim ("Joyce Kim") (collectively,
"defendants").[1]  (D.I. 1)  On May 21, 2013, the U.S. government declined to intervene in
the case.  (D.I. 6)  On May 24, 2013, the case was unsealed.  (D.I. 7)  On November 14,
2013, defendants moved to dismiss the complaint for lack of subject matter jurisdiction
pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim
pursuant to Federal Rule of Civil Procedure 12(b)(6).  (D.I. 17)  Rather than respond to
defendants' motion, on January 10, 2014, Moore filed its first amended complaint.  (D.I.
23)  In the first amended complaint ("amended complaint"), Moore brings claims against
defendants of violation of the FCA, reverse false claims for violation of the Vessel
Documentation Act, conspiracy to violate the FCA, conspiracy to commit reverse false
claims for violation of the Vessel Documentation Act, reverse false claims for violation of
the Act to Prevent Pollution from Ships ("APPS"), and conspiracy to commit reverse
false claims for violation of APPS.  (*Id.* at ¶¶ 110-62)

---

[1] Former defendants Dongwon Industries Company, Ltd. ("Dongwon"), Jayne Songmi
Kim ("Jayne Kim"), and Jaewoong Kim were dismissed from this case on September 23,
2014 because they did not enter appearances, did not retain counsel, and Moore did
not file proofs of service within 120 days pursuant to Federal Rule of Civil Procedure
(4)(m).  *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 69 F.
Supp. 3d 416, 430 n. 11 (D. Del. 2014).

On February 11, 2014, defendants filed a motion to dismiss Moore's amended complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 25) Because the case was filed after the FCA was amended by the Patient Protection and Affordable Care Act ("PPACA"), the court applied the pre-PPACA FCA to the pre-amendment conduct and the post-PPACA FCA ("amended FCA") to later conduct. *Majestic Blue Fisheries, LLC*, 69 F. Supp. 3d at 423. The court granted defendants' motion to dismiss the amended complaint on September 23, 2014, dismissing the complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Id.* at 416. Specifically, the court concluded that Moore's claim was barred by public disclosure and that Moore was not an original source of knowledge for the alleged fraud. *Id.*

On October 23, 2014, Moore appealed the dismissal to the Third Circuit. (D.I. 39) The Third Circuit determined that Moore was an original source under the post-PPACA public disclosure bar. *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Presently before the court is defendants' Rule 12(b)(6) motion to dismiss in relation to Moore's claims arising under the post-PPACA FCA. (D.I. 25) This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3729, 3730(b).

## II. BACKGROUND

### A. Parties

2

Moore is a professional association of attorneys with its principal office located in Coral Gables, Florida.  (D.I. 23 at ¶ 11)

Majestic Blue and Pacific Breeze (collectively, "the LLCs") are Delaware limited liability corporations with a principal place of business located in Piti, Guam.  (*Id.* at ¶¶ 12-13)  The LLCs own, respectively, two fishing vessels, the Majestic Blue and the Pacific Breeze ("the vessels").[2]  (*Id.*)

Joyce Kim is a Korean-born, naturalized U.S. States citizen who currently resides in California.  (*Id.* at ¶ 17)  Former defendant Jayne Kim is a Korean-born, naturalized U.S. citizen who currently resides in Korea.  (*Id.* at ¶ 16)  Jayne Kim and Joyce Kim are sisters, and both are daughters of Jaewoong Kim, a former executive of Dongwon.  (*Id.* at ¶¶ 15-17)  Jayne Kim is the majority shareholder and president of Majestic Blue and the minority shareholder and treasurer of Pacific Breeze.  (*Id.* at ¶ 16)  Joyce Kim is the majority shareholder and president of Pacific Breeze and the minority shareholder and treasurer of Majestic Blue.  (*Id.* at ¶ 17)

Former defendant Jaewoong Kim is a citizen of and resides in South Korea.  (Id. at ¶ 15)  He is the father of Jayne Kim and Joyce Kim, and the brother of J.C. Kim, Dongwon's chairman.  (*Id.*)  Jaewoong Kim is also a former executive of Dongwon.  (*Id.*)

## B. The South Pacific Tuna Treaty

---

[2] Former defendant Dongwon is a South Korean corporation with its principle place of business in Seoul, South Korea.  (*Id.* at ¶ 14)  Dongwon is in the business of buying, processing, and selling tuna and tuna products, and was the owner of the vessels prior to 2008.  (*Id.* at ¶¶ 26-27)

Under the South Pacific Tuna Treaty ("SPTT"), the U.S. provides approximately $18 million in economic assistance annually to the Foreign Fisheries Association ("FFA"), an international body designated as the "administrator" of the SPTT. (*Id.* at ¶¶ 29, 31-32) This money is allocated to the Pacific Island nations that are signatories to the treaty. (*Id.* at ¶ 32) In return, the SPTT provides for a certain number of fishing licenses to be issued to U.S. fishing vessels, permitting them to fish for tuna in exclusive zones in the South Pacific, "some of the most tuna rich waters in the world." (*Id.* at ¶¶ 29-30) South Korea is not a signatory to the SPTT.[3] (*Id.* at ¶ 30)

To qualify for a SPTT license, a fishing vessel needs a U.S. Coast Guard Certificate of Documentation with a registry endorsement. (*Id.* at ¶ 33) This certification is only available to vessels "under the ownership and control of U.S. citizens." (*Id.*) The license applications are submitted to the National Marine Fisheries Service and are issued by the FFA. (*Id.* at ¶ 31)

## C. Alleged Facts Related to Claims Under the False Claims Act and Vessel Documentation Act

On March 25, 2008, Joyce Kim and Jayne Kim founded the LLCs and registered the vessels. (*Id.* at ¶ 36) There are no other purported owners or shareholders in the LLCs. (*Id.* at○¶ 43) Moore alleges that Joyce Kim and Jayne Kim each only invested $50 in the LLCs, with no further investment. (*Id.* at ¶ 37)

---

[3] The SPTT signatory nations include: U.S., Australia, Cook Islands, Federated States of Micronesia, Fiji, Kiribati, Marshall Islands, Nauru, New Zealand, Niue, Palau, Papua New Guinea, Solomon Islands, Tonga, Tuvalu, Vanuatu, and Samoa. (D.I. 23 at ¶ 5)

4

On April 23, 2008, Dongwon executed bills of sale that allegedly sold the vessels to the LLCs for $10 each. (*Id.* at ¶ 41)  In the original purchase and sale agreement executed by Dongwon, the LLCs agreed to pay $4.4 million for each vessel.  The agreement did not hold Joyce Kim or Jayne Kim responsible for the debt and no mortgage was taken out on the vessels. (*Id.* at ¶ 38)  Moore alleges that this arrangement occurred because Dongwon never actually gave up ownership or control of the vessels; instead, Dongwon used Joyce Kim and Jayne Kim as "straw owners" of the LLCs because of their American citizenship. (*Id.* at ¶¶ 28, 29, 39)

After transferring ownership of the vessels to the LLCs, the LLCs applied for FFA fishing licenses to fish for tuna in the waters covered by the SPTT. (*Id.* at ¶¶ 48-53)  In April and May 2008, William Phil, a purported manager of the LLCs, sent emails to the National Oceanic and Atmospheric Administration seeking SPTT licenses. (*Id.* at ¶ 49)  Moore alleges that William Phil was not a manager of the LLCs, but "is actually a pseudonym for three Korean nationals who are also employees of Dongwon who operated under the false name in order to sound more like an American citizen." (*Id.* at ¶ 50)  Moore further alleges that neither Joyce Kim nor the general manager of the LLCs, Jurgen Unterberg ("Unterberg"), knew who William Phil was, although both believed he was the manager of the LLCs, reinforcing Dongwon's control over the LLCs "to the exclusion" of "U.S. citizens that purported[ly] owned and operated [the vessels] according to the LLCs' corporate documents and the [v]essels' documentation." (*Id.* at ¶¶ 49, 57)

5

On May 15, 2008, Joyce Kim and Jayne Kim, on behalf of the LLCs, submitted initial applications for U.S. documentation for the fishing vessels. (*Id.* at ¶ 51) The applications certified that within the LLCs, "non-citizens do not have authority within a management group, whether through veto power, combined voting, or otherwise, to exercise control over the LLC." (*Id.* at ¶ 52) Moore alleges that this certification was a "misrepresentation" of the actual control of the LLCs, and that the LLCs were actually controlled by Dongwon, a foreign corporation. (*Id.* at ¶ 53) On May 20, 2008, the National Vessel Documentation Center granted temporary U.S. documentation for the vessels. (*Id.*)

On May 21, 2008, the LLCs signed agreements with Dongwon for crew manning, ship maintenance, supply, insurance, and tuna supply. (*Id.* at ¶ 54) Moore alleges that these agreements authorize Dongwon to exercise complete control over the vessels and the LLCs. (*Id.* at ¶¶ 54, 67-71) Furthermore, Moore alleges that Dongwon exercised control over the vessels beyond these agreements by controlling the employment of American captains, who were necessary to maintain the facade of American control but who did not exert any actual control. (*Id.* at ¶¶ 72-87)

On July 1, 2008, the FFA issued certificates of registration for the vessels, allowing them to fish in SPTT waters under the U.S. flag. (*Id.* at ¶ 60) Moore alleges that the grant of the FFA licenses was based on false statements in the application indicating American control of the LLCs and vessels, when in fact both were controlled by Dongwon. (*Id.*) Moore alleges that this "fraud" continues through today, as the

Pacific Breeze vessel continues to fish in the SPTT-protected waters under the U.S. flag.[2]  (*Id.* at ¶ 91)

### D. Alleged Facts Related to Claims Under APPS

In December 2008, Captain John Jeskevicius ("Jeskevicius"), captain of the Majestic Blue vessel, realized that the crew onboard the ship was illegally dumping trash over the side of the vessel.  (*Id.* at ¶¶ 92-95)  Through December 2008, Jeskevicius reported the illegal activity to Unterberg multiple times via email.  (*Id.* at ¶¶ 95-98, 100)  On December 27, 2008, Jeskevicius resigned as captain, allegedly because of the illegal garbage dumping.  (*Id.* at ¶ 99)  In fall 2009, Captain Doug Pine ("Pine"), the next captain of the Majestic Blue vessel, also observed illegal dumping.  (*Id.* at ¶¶ 102-05)  Despite having knowledge of this illegal activity, defendants allegedly did nothing to change the Majestic Blue vessel's policies or otherwise stop the dumping from occurring.  (*Id.* at ¶ 106)  Hill, the last captain of the Majestic Blue vessel before it sank, observed illegal dumping as well.  (*Id.* at ¶¶ 106-09)  Moore alleges that "[Hill] and other crew members knew about the dumping but intentionally did not report it."  (*Id.* at ¶ 108)  Hill allegedly told Unterberg, but Moore alleges that Unterberg had no authority within Majestic Blue to address the problem himself.  (*Id.* at ¶ 109)

### III. STANDARD OF REVIEW

---

[2] The Majestic Blue vessel maintained its SPTT licenses until it sank in June 2010.  (D.I. 23 at ¶¶ 83, 91)  The captain at the time, David Hill ("Hill"), died.  (*Id.* at ¶ 83)  Moore represented Hill's wife in a wrongful death action against Dongwon and Majestic Blue. (D.I. 26 at 4)  A jury trial was held, and Majestic Blue and Dongwon were ordered to pay a judgment of $3,205,795.  *Hill v. Majestic Blue Fisheries, LLC*, Civ. No. 11-00034, 2015 WL 3961421, at *1 (D. Guam June 30, 2015).

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n. 2 (3d Cir. 1994).

8

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

### A. The False Claims Act

The FCA creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A) (2009). The FCA seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 281 (2010). The FCA was amended on March 23, 2010[4] by the PPACA, which provides that:

> (1) [A]ny person who
> (A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim;
> (C) conspires to commit a violation of subparagraph (A), (B), (D),
> (E), (F), or (G); ) . . .

---

[4] Effective July 22, 2010.

9

(G) is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729(a)(1) (2011).  In order to establish a prima facie FCA violation under §3729(a)(1), plaintiff must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011).  The Third Circuit has acknowledged two categories of claims under the FCA, factually false claims and legally false claims. *Id.* at 305.  A factually false claim occurs "when the claimant misrepresents what goods or services that it provided to the Government." *Id.*  A legally false claim occurs "when the claimant knowingly [and] falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment" and is "based on a 'false certification' theory of liability." *Id.*  False certification claims have been divided into express false certifications and implied false certifications. *Id.*  An express false certification claim occurs when a claimant falsely certifies it is in compliance with material conditions that are prerequisites to government property or payment. *Id.*  An implied false certification claim occurs when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements . . . if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States*, — U.S. —, 136 S. Ct. 1989, 1999 (2016).

10

In the case at bar, Moore alleges defendants made "yearly false citizenship certifications to obtain a government benefit." (D.I. 29 at 26) These involved an express false certification that "the LLCs were controlled by U.S. citizens" and "implied false certifications" that the LLCs failed to disclose regulatory violations which affected the LLCs' eligibility. (*Id.* at 26-27) Moore argues that the SPTT licenses meet the definition of property under the FCA and constitute a valid FCA claim. (D.I. 29 at 28) Defendants contend that their requests for SPTT fishing licenses "do not constitute 'claims' under the FCA" because licenses which require an upfront fee are purely regulatory and do not constitute "governmental or personal property interests." (D.I. 26 at 23-24)

The FCA does not define what constitutes property. However, the Third Circuit has held that when a court determines "whether a particular interest is property for purposes of the fraud statutes," it should "look to whether the law traditionally has recognized and enforced it as a property right." *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994); *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) ("Additionally, the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right."); *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988) ("That the right at issue . . . has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes."). To determine if the SPTT fishing licenses constitute property for purposes of a FCA claim, the court must determine if SPTT fishing licenses

as issued by the FFA constitute a traditional property right. Of note, a SPTT license did not confer exclusive privileges to fish in the areas covered by the treaty. Rather, defendants and other applicants "lacked the authority to exclude others from the . . . [f]ishery." *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002). This weighs against Moore's definition of SPTT licenses as property, as the right to exclude is considered one of the most important indicators of a property right. *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (holding that the "right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'").

To be considered property, the SPTT licenses conferring a "right to use a vessel to fish" must exist "independent of the regulatory regime." *Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce*, 720 F. Supp. 2d 564, 576 (D.N.J. 2010); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1377-80 (Fed. Cir. 2004) ("Because the right . . . was not inherent in its ownership of the [property], [but instead was totally dependent upon the regulatory scheme,] American Pelagic did not suffer the loss of a property interest . . . when its . . . permits were revoked."). The Supreme Court has held that fishing licenses are "purely regulatory" and are "not 'property' in the government regulator's hands." *Cleveland v. United States*, 531 U.S. 12, 21-22 (2000).[5] The SPTT licenses are approved by the FFA administrator who "in

---

[5] In *Cleveland*, the Supreme Court held that the Louisiana government did not part with property when issuing a video poker license to businesses for the purpose of operating video poker machines. 531 U.S. at 15. Although the licenses were analyzed under the federal fraud statutes, the analysis is relevant for determining what constitutes property under the federal fraud statutes.

his or her sole discretion, may approve fewer license applications than there are licenses available for any given licensing period or at any given time." 50 C.F.R. § 300.32(e) (2011). Approval for a SPTT license requires a party to meet certain conditions in order to engage "in pursuits that private actors may not undertake without official authorization," and subjects license holders to official inspections. *Cleveland*, 531 U.S. at 21. Similar to the video poker licenses issued by the State of Louisiana in *Cleveland*, the SPTT licensing requirements establish "a typical regulatory program" where government administrators use their discretion and follow regulations to decide when to issue licenses. *Id.* While Moore asserts that the FFA is a "non-governmental third party," the FFA is an intergovernmental organization, subject to international law, and comprised of representatives from each of the 17 SPTT Pacific Island members. (D.I. 46 at 3)[6] This intergovernmental organization uses regulatory procedures and the powers granted to it by each of the SPTT governments to make discretionary decisions in a regulatory licensing program.[7] It was under this regulatory program that the SPTT license was granted in the case at bar. The right to fish using a SPTT license does not exist independent of a "regulatory regime." *Gen. Category Scallop Fishermen*, 720 F. Supp. 2d at 576. Indeed, the licenses granted through a regulatory process "do not possess a valid property interest in such permits." *Id.; Am. Pelagic Fishing Co.*, 379

---

[6] The court cites to page numbers assigned by ECF for D.I. 46.

[7] To the extent that the National Marine Fisheries Service issues approvals for a SPTT license, the process also resembles the video poker licenses, because the U.S. government issues licenses using regulatory procedures that resemble "other licensing schemes long characterized . . . as exercises of state police powers." *Cleveland*, 531 U.S. at 21.

F.3d at 1377, 1380 ("[U]se of . . . vessels to fish in the [Exclusive Economic Zone] . . .

does not equate to a cognizable property interest."). Under this precedent, Moore's

attempts to define SPTT licenses as property under the FCA are unpersuasive.

Because a SPTT license is not property, there is no "plausible claim for relief" under the

FCA and, therefore, the complaint must be dismissed. *Fowler*, 578 F.3d. at 211.[8]

## B. Reverse False Claims

Reverse false claims are governed by § 3729(a)(1)(G) of the FCA, which

imposes liability when a person:

> [K]nowingly makes, uses, or causes to be made or used, a false record or
> statement material to an obligation to pay or transmit money or property to
> the Government, or knowingly conceals or knowingly and improperly
> avoids or decreases an obligation to pay or transmit money or property to
> the Government.

31 U.S.C.A. § 3729(a)(1)(G) (2009). The FCA further defines "obligation" as "an

established duty, whether or not fixed, arising from an express or implied contractual,

grantor-grantee, or licensor-licensee relationship, from a fee-based or similar

relationship, from statute or regulation, or from the retention of any overpayment." *Id.*

Moore brings reverse false claims against defendants for violation of the Vessel

Documentation Act, 46 U.S.C. § 12151 (2006), alleging that defendants "used false

records and/or statements to conceal the true nature of control over the vessels" in

---

[8] Although Moore cites Third Circuit precedent which endorses a First Circuit decision
that liens may attach to fishing licenses, the case is distinguishable because it involved
a lien rather than the license itself. The case at bar more closely resembles *Gen.
Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106 (3d Cir.
2011), where the Third Circuit affirmed the district court's decision that fishing licenses
issued pursuant to the Magnuson–Stevens Act do not have a property right independent
of a regulatory regime.

order to avoid paying penalties to the government and to avoid seizure of the vessels.

(D.I. 46 at 5)  By falsely certifying that the vessels were controlled by U.S. citizens when

the vessels were actually controlled by Dongwon, a Korean company, Moore alleges

that defendants violated § 12151(b) of the Vessel Documentation Act which states:

> A vessel and its equipment are liable to seizure by and forfeiture to the
> Government if-- (1) the owner of the vessel or the representative or agent
> of the owner knowingly falsifies or conceals a material fact, or knowingly
> makes a false statement or representation, about the documentation of
> the vessel or in applying for documentation of the vessel . . . (6) the vessel
> is a documented vessel and is placed under the command of a person not
> a citizen of the United States, except as authorized by section 12131(b) of
> this title.

46 U.S.C.A. § 12151 (2006).  The Vessel Documentation Act further states that "a

person that violates this chapter or a regulation prescribed under this chapter is liable to

the U.S. Government for a civil penalty of not more than $15,000.  Each day of a

continuing violation is a separate violation."  Id.  Overall, Moore alleges that defendants

improperly used false statements to avoid their obligation to pay money or property to

the U.S. government.  (D.I. 46 at 5)

Moore additionally alleges that defendants made false statements and

intentionally failed to report oil and other waste discharge to avoid paying fines under

the APPS.  (D.I. 23 at ¶¶ 155-57)  The APPS states, in relevant part:

> (b) A person who is found by the Secretary, or the Administrator as
> provided for in this chapter, after notice and an opportunity for a hearing,
> to have-- (1) violated the MARPOL Protocol, Annex IV to the Antarctic
> Protocol, this chapter, or the regulations issued thereunder shall be liable
> to the United States for a civil penalty, not to exceed $25,000 for each
> violation; or (2) made a false, fictitious, or fraudulent statement or
> representation in any matter in which a statement or representation is
> required to be made to the Secretary, or the Administrator as provided for
> in this chapter, under the MARPOL Protocol, Annex IV to the Antarctic

15

Protocol, this chapter, or the regulations thereunder, shall be liable to the
United States for a civil penalty, not to exceed $5,000 for each statement
or representation.

33 U.S.C.A. § 1908 (2014). The APPS further clarifies that "the civil penalty shall be

assessed by the Secretary, or the Administrator." *Id.* In order to determine the civil

penalty, the Secretary or the Administrator "shall take into account the nature,

circumstances, extent, and gravity of the prohibited acts committed and, with respect to

the violator, the degree of culpability, any history of prior offenses, ability to pay, and

other matters as justice may require." *Id.*

Defendants raise two arguments in opposition to Moore's reverse false claim

allegations. First, defendants contend that statements made by the LLCs were not false

and, therefore, there is no basis for a reverse false claim. (D.I. 26 at 31) At this stage

of the litigation, however, the court must accept plaintiff's allegations as true. *Erickson*,

551 U.S. at 94 ("In addition, when ruling on a defendant's motion to dismiss, a judge

must accept as true all of the factual allegations contained in the complaint."). 

Accordingly, taking the facts in the light most favorable to Moore, the court finds

defendants' statements were false for purposes of this motion.

Since Moore has sufficiently pled falsity, the court turns to defendants' argument

that false statements "to avoid potential liability, fines, or penalties are legally insufficient

to state a reverse false claim." (*Id.* at 33) The court acknowledges that the Third Circuit

has not directly addressed whether potential civil fines are within the scope of the FCA.

However, multiple district courts in this circuit have held that potential fines are

insufficient to establish a reverse false claim. *United States v. Southland Gaming of the*

16

*Virgin Islands, Inc.*, 2016 WL 1317495, at \*14 (D.V.I. Mar. 31, 2016) (holding that the language of "the reverse false claims provision was not meant to cover the type of contingent obligations Plaintiff contemplates—i.e., unadjudicated and unassessed statutory fines"); *United States ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793, at \*3 (E.D. July 21, Pa. 2015) (noting contingent obligations to pay money which depended on the government's discretion are not covered by the FCA); *see also Zelenka v. NFI Indus., Inc.*, 436 F. Supp. 2d 701, 705 (D.N.J. 2006) (holding there was no obligation to pay fees contingent on inspections that have not occurred). Multiple circuit courts have also held that reverse false claims are not meant to cover unassessed statutory fines. *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1195 (10th Cir. 2006) ("the fact that the making or using of a false statement or record might result in a fine or a penalty is insufficient to establish a[n] . . . obligation"); *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) ("It is clear to us that, as the government argues, the reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed."); *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 738 (6th Cir. 1999) ("Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute. Examples of contingent obligations include those arising from civil and criminal penalties that impose monetary fines after a finding of wrongdoing.").

17

In the case at bar, Moore alleges that defendants defrauded the U.S. government by making false statements to avoid penalties under the Vessel Documentation Act.[9] Moore has also alleged that defendants defrauded the U.S. government through false statements to avoid penalties under the APPS.[10]  However, liability under these acts is contingent on the government's discretion to impose fines on defendants, as evidenced by the statutory language.  As such, these potential obligations to pay unassessed fines are not within the scope of the FCA.  Because reverse false claims do not extend to unassessed statutory fines, Moore fails to state a valid FCA claim. *Am. Textile Mfrs. Inst., Inc.*, 190 F.3d at 738.  Therefore, Moore's reverse false claims must be dismissed.[11]

## V. CONCLUSION

For the aforementioned reasons, the court grants defendants' motion to dismiss the amended complaint.  (D.I. 25)  An appropriate order shall issue.

---

[9] As discussed above, Moore alleges the LLCs made false statements by claiming that non-citizens did not have authority over the LLCs and by claiming the vessels were under the control of United State citizens, when the vessels were controlled by Dongwon.  (D.I. 23 at ¶¶ 35-62, 148)

[10] Moore alleges that defendant Majestic Blue failed to observe MARPOL regulations and regularly dumped plastic waste and oil from the vessel.  (D.I. 23 at ¶¶ 92-109, 152)

[11] Because Moore's underlying false claims and reverse false claim allegations fail to state a valid claim under the FCA, its conspiracy claims fail as well. *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, Civ. No. 94-7316, 2000 WL 1207162, at *11 (E.D. Pa. Aug. 24, 2000) ("An agreement to commit a lawful act by lawful means . . . is not actionable.").